Good morning. To please the Court, my name is John Scott. I was the attorney for the plaintiff Randall Dunklin below and also here with my co-counsel Eric Saffire arguing today. We're asking the Court to reverse three decisions of Magistrate Judge Spiro. Number one, his And if the Court does not reverse qualified immunity, we're still left with the issues of Manel. Municipal liability, since a party can proceed to municipal liability if there's qualified immunity, but of course the jury has to decide there's a constitutional violation as a predicate to determining municipal liability, and we have two theories that are established by the evidence. One has to do with a training policy, and the other issue has to do with ratification. I would like to start, though, with the shooting itself, which I guess is more common these days, but I've been doing this over 35 years, the first time I've had a case where a shooting was on video. So this is new for me. And I assume that the Court has seen the video. If you have not, I certainly encourage you to see the video because it is the best evidence, and I agree with the teachings of Supreme Court in Scott v. Harris that when you have a video, it is the best evidence, and at some point, the Supreme  Court, attorneys only have so much ability to try to spin the facts to create a reality that isn't there, to create a virtual reality. I'm not asking this Court to create a virtual reality. The facts in this case are pretty simple. As shown in the video, Mr. Dunklin, who was in a wheelchair during the entire incident from beginning to end, let's just say, hey, you was having a bad day. Well, he had a bad day. He stabbed a police officer. That's a bad day. And I don't mean to be flippant. It's a very important predicate. And I don't know that he was in the chair the whole time. Can you help me out with that? The record tells me that he had suffered from polio. He had some use of his legs. When the stabbing occurred, it said that he, in one place, it says that he lunged. In another place, it says that he swiped. He somehow came up out of the chair to some degree. What's the best evidence about that? Well, I think the best evidence is the fact that he did lunge. He was in the chair. Officer Saw, who was in plain clothes, comes up to him, and he reacted to Officer Saw approaching him with, I believe, pepper spray. And he acted in self-defense, and he gestured with a knife, and Officer Saw got stabbed. Wasn't the first officer, the officer who arrived on a motorcycle, in uniform? Yes. Okay. But the person who was stabbed was not in uniform? Correct. Okay. So back to the question about the best evidence of him, do we know the extent to which your client got up out of the chair to stab or lunge? Do we know that he did? Well, I don't know that he did. There is supposedly some video footage of that general incident. The video footage that I've seen never shows him getting out of the chair. It's not very good footage. It's really tough. Right. Okay. So what we're left with is Officer Saw claiming that he kind of vaguely gestured or kind of tried to get up and lunged at him. The point being that let's assume that's true. Let's assume he stood up and stabbed him. A jury acquitted him of the stabbing, found that he acted in self-defense. But more importantly, what's happening in the several seconds before he shot? Because really, all these cases come down to, is there an immediate threat when the officer pulls the trigger? Right. If I could interrupt for just a minute, because we have an audience again borrowing on my colleague's setting the scene. This happened where? 10th and Howard. Not far from here. Which is approximately four blocks away. Spitting distance from this courthouse in the morning, broad daylight. And a lot of these cases criticize the tactics of the police before the shooting. There was an initial confrontation. Yes. The police officer came up on a motorcycle in uniform. Two other guys arrived not in uniform. Actually, five other guys arrived not in uniform. Eventually. Yes. Officer Saar was stabbed, as we've just indicated. And I think, is there pepper spray at this point? Yes. Okay. And then your client wheeled around the corner. Yes. Okay. So now we're getting to the scene of the shooting. Could you just take one second and explain that for the folks in the courtroom? Yes. Well, he's, my client is retreating in his wheelchair. He's retreating from the officers. And after he gets somewhat down the block, he realizes that, hey, he's surrounded. Basically, there's officers coming, there's sirens, there's people in front of him. There's probably people behind him. He stops. And there's kind of a standoff. And he's standing there and they're telling him to drop the knife. And he isn't. He's not complying. He's disobeying orders to drop the knife. And he's sitting in his wheelchair for, we don't know how many minutes before the video started, but for some period of time where it's a standoff, he's not moving. Right. All right. Half a dozen police officers. Yes. And they have a plan. And it's a great plan. I mean, they could have had other plans, but the plan they came up with, I'm not criticizing. The plan was, we'll have an officer shoot him with a beanbag round. And when he gets hit with a beanbag round, presumably he'll drop the knife. And we're good. We're done. Good plan. And the plan worked. As soon as he got hit by the beanbag round, what did he do? He tossed the knife, sidearm on the ground. The plan worked. What's the best evidence it was sidearm? I have looked and looked. The video. So we can see he didn't drop the knife in the video. And then there's a dispute. I mean, he clearly threw it with some force, because it's, you know. He did, in a sidearm fashion. Everybody agrees. Defendant's brief agrees it's a sidearm throw. Well, the defendant's brief says that he cocked his arm, whatever that means, you know, whether it was back like this or back to the side, and that he was shot. The officers, both of them, two in this case, decided to shoot in anticipation of him throwing the knife. Is that a fair statement? This is now down to within a second. That's what they're claiming. And what's interesting about that is, number one, they took the — it was — they could anticipate that when he gets shot, he's going to throw the knife. That's foreseeable. Hey, we're going to shoot him. Either before we shoot him or when we shoot him, he could throw the knife at us. At any time during this whole event, he could throw the knife at us. That's why they stood back the position they were in. And they had total control of — they weren't cornered in a room like in the Sheehan case. They weren't trapped in a room. They were out in the middle of the street. They took positions consistent with their training and common sense, where if he throws this knife at us at any given time, I'm not worried about getting hit. So in Sheehan, they were outside the room, right? It was their determination that in order to protect the public, they would go in the room. So closing the distance between themselves and the violent suspect was not considered by the Supreme Court to rule out their protection. Great. Fine. Yeah, the Supreme Court said, I'm going to give you qualified immunity on entering the room. Maybe on the exigent circumstance, I'm going to give you the benefit of the doubt it was okay to go in the room. Fine. All right. But Sheehan was coming at the officer with a knife and was within a couple steps of stabbing an officer within striking distance. I mean, with about to, with, you know, within a second. He had already, your client had already stabbed the police officer. Yes. Yes, he had. Okay. And so is the city's position that because he stabbed him, he deserved to be shot? Is that it? Well, it was clear that. So you stabbed somebody and five minutes later, I'm going to shoot you because you stabbed me five minutes ago and you're sitting there in a wheelchair? And I just think that, okay, great. You stabbed me five minutes ago. Well, you got it coming. Bam. So not to put too fine a point on this, but I think the time interval is really important. And I don't know how many minutes later it was by the time he went around the corner and there was this standoff situation and the shooting. What's the best evidence of that? I think the city came up with a timeline. It's somewhere between five and ten minutes. It might be somewhere in the record. I mean, from my point of view, whether it's five minutes or ten minutes is. So there was a delay as part of your argument and they could stand back and maintain their own personal safety is your argument? Of course. They did. I mean, it's obvious from looking at the video. He did throw the knife and it did hit somebody's shoe or foot, right? Yeah. Apparently it. How long were they supposed to wait? The issue isn't whether they're supposed to wait or not. I'm not. The issue isn't tactics. Well, you've described it as a standoff and it's in a crowded downtown area. What are they supposed to do? Exactly what they did do. Hit him with a beanbag round. He drops the knife and you go and hook him up and you take him to jail. Real simple. It's not complicated. I shoot you with a beanbag. You drop the knife. I go over. I hook you up. You're going to jail. Okay. So they're going to get up in just a second. And so I just want to give you a chance to maybe use some of your time on this. What they're going to say is they didn't shoot after the knife was thrown. It was virtually simultaneous. So they knew the knife was going to be thrown. What's your response to that? How do you know it's going to be thrown at you? I mean, they both said, I thought, and they were standing from Officer Saw and Malinger were about as far away from each other as I am from you. And Dunklin is where the clerk is. Yes, but if he's throwing it, your argument is he's throwing it sidearm. So how are you supposed to know where it's going if he's going to throw a knife sidearm? Exactly. Exactly my point. So what gives you a reasonable belief it's being thrown at you? Does the officer have to wait? Well, if you don't know, if you don't know where it's being thrown and you're at a distance that you took to be far enough away from him in the event he's going to throw the knife, then yeah, you took a position that you believed was safe. And you could anticipate when he gets hit by the beanbag, if he has an order, he's thrown the knife, he's going to drop it or toss it. But for me, this is training in common sense. Police are trained, if you're confronting somebody who's armed with a knife, for example, OK, you ask them to drop it. They don't. You're going to be a distance away from them that if they come at you, yeah, I'm going to shoot you because you're coming at me. Fine, good, no problem. But I'm right now standing a distance away from you, so I feel comfortable. If you go to throw that knife at me, it's not going to hit me. I'm going to be able to duck it. Those officers could have, if they felt they weren't safe, they could have backed up another couple of feet. Nothing stopped them. The inference, the reasonable inference is those officers took positions that they thought were safe. Don't leave the microphone. We won't record you if you're a friend. Thank you. That's a reasonable inference. And for summary judgment, I think last time I heard you draw inferences in favor of the nonmoving party. My point simply is that this is not immediate life-threatening situation. It just isn't. Or alternatively, let a jury decide if it is. But the law is very simple there. Is there an immediate threat of serious bodily injury or death? That's for the constitutional violation, right? Yes. Not for the clearly established qualified immunity. And as to clearly established, you know, what troubles me a little bit, there's a Hope versus Pelzer case, which basically is a Supreme Court decision telling other courts, you know, there doesn't have to be another case directly on point all four squares for, you know, for there to be or not to be qualified immunity. And then some of the cases, you know, at least the Sheehan case makes it sound like, whoa, well, if we don't have one directly on all fours, there's qualified immunity, which doesn't make sense to me. For example, Walter Scott in South Carolina, he gets shot in the back running away from a police officer. Does the officer get qualified immunity if he gets sued? Because we don't have another case directly on point where an officer shot somebody who was fleeing from him who hadn't committed a crime other than a traffic violation. Tennessee versus Garner, hey, maybe you're not supposed to do that. But we don't have a case with these exact facts. Therefore, does the officer who shot Walter Scott get qualified immunity? I mean, the results of this become absurd. We're not arguing that the Supreme Court is wrong. How could I? They're always right. You have just a few seconds left. Do you want to save those for later? I do. And because I also – if you do find qualified immunity, I think I have Monell claims that should go forward, and I'd really like to address those if I have a moment. Thank you. You have 36 seconds to hear from the government. Good morning, and may it please the Court. I'm Christine Van Aken for the City and County of San Francisco and the individual officers. I do want to go back to the facts, and I'll discuss them in the light most favorable to plaintiff, which, of course, is how the Court views them. But I think they are not what you've just heard. We know that Mr. Dunklin is on a rampage and that Officer Koenig responds on his motorcycle. We know that four other plainclothes officers then arrive and come to assist Officer Koenig. And what happens in the Howard Street video – I admit, it's not terribly clear, but you can see – what you see is Mr. Dunklin's wheeling motion with his wheelchair. And what he does is he wheels his chair towards Officer Pascua, who retreats out of the way, and then Mr. Dunklin abruptly changes the direction of his wheelchair and approaches Officer Saw, who is backed into a parking meter. Officer Saw tries to stop Mr. Dunklin's attack by pepper-spraying him, and Mr. Dunklin responds by stabbing him. Now, there's some suggestion in Appellant's opening brief that this is a self-defense reaction, a flail, something other than a stab, but there's no evidence of that. I don't rely on the video for this. I rely on Officer Saw's declaration and deposition testimony and that of the other officers, and there's no evidence in this record, there's no dispute by Mr. Dunklin that that's not true. I was merely flailing. I was merely acting in self-defense. That's simply argument of counsel. There's no evidence of that in the record. And so then what happens is Mr. Dunklin rounds the corner from Howard Street onto 10th Street. And we do know that this isn't 10 minutes long because the iPhone video, which San Francisco submitted into evidence and it's before this Court, the iPhone video actually records as the officers are rounding the corner onto 10th Street, and the whole encounter on 10th Street is about three or four minutes long. It's not a 10-minute standoff. And what happens is Mr. Dunklin goes, he's in the street. He's still got his knife. He admits in his deposition that he's received about two dozen commands to drop the knife that he ignores. And there is a bit of a standoff. The officers take a position 20 feet away. Now, that's not because the officers reached some reasonable conclusion that 20 feet is a safe distance from a thrown knife. That's not it at all. What the record shows, and this is an excerpt of Record 383, is Sergeant Malinger says, it didn't occur to me that he would throw the knife. Actually, I'm not sure if it's Malinger or Saw. It didn't occur to me that he would throw the knife. I didn't want someone to get stabbed. And so they took a position. They were concerned that Mr. Dunklin would try to stab them again. They took a position 20 feet away to avoid that. It didn't occur to them that the knife would be thrown. And I just want to submit that, you know, it's not a Fourth Amendment violation to be wrong about the degree of threat that a suspect presents. So they're 20 feet away from Mr. — in this sense, in sort of tactical, in failing to protect themselves. It's not a Fourth Amendment violation. If you're worried about getting stabbed 20 feet away sounds like a pretty safe bet to me. Right. And if you're — yes. But it doesn't occur to them to worry about being thrown — the knife being thrown. That's my point here. So they do take a position that they think is safe. And they tell Mr. Dunklin again to drop the knife. He doesn't do so. Two other uniformed officers arrive. And this is the team with the beanbag shotgun. They shoot Mr. Dunklin. He appears for a moment to be about to comply. But then you see from the iPhone video that he throws the knife. And again, there's no evidence here that he simply is dropping the knife or that it's a gentle toss. The district court says there's great force. The officers characterize it as a throw with force. And there's no evidence for Mr. Dunklin to contradict that. He never submits a declaration saying, no, I simply tossed it. So he throws the knife sidearm. It's true that the officers don't know exactly where the knife is going to go. But they're not required to wait. What they testify to is that they shoot in reaction to the throwing motion. And in fact, plaintiff has stipulated to that. This is an excerpt of Record 751, Stipulations 18 and 19. Plaintiff stipulates that the two shots were in reaction to the throwing motion. And so that's my recitation of the facts. Here's my argument. Deadly force is authorized, of course, when an officer, would believe herself or others to face a threat of serious physical harm. A thrown knife is a threat of serious physical harm. I don't think there can be a dispute about that. And here the officers reacted to that throw by using deadly force. That's allowed under the Fourth Amendment. And I think the Lau versus California case establishes that definitively. That was in San Francisco's 28J letter that we submitted to the court last week. It's a 2014 case where the suspect was holding a rock above his head, threatening to throw it. He hadn't yet thrown it. But the court nonetheless found that there was no Fourth Amendment violation where the officer shot because he was eight feet away and threatening to throw. So it can't be a constitutional difference here that Mr. Dunklin was faster than Mr. Lau. That he managed to complete the throw before the officers were able to completely react by shooting. And it's not disputed that their reaction was in reaction to the motion of beginning the throw. Under Lau, that is not a Fourth Amendment violation, and that's clear. But even if, even if there were some question about that, qualified immunity must apply here. I think Sheehan makes it very clear the Court has to find a case that is at least somewhat specific, somewhat analogous to the facts, so that only an incompetent officer would misunderstand the rule of law that applied. And here, there are many cases that had, were published and available before this incident, including Blanford, the 2005 case at this court, where the suspect was merely holding a knife in a threatening way from farther away and hadn't made a motion to throw. There was also the Martinez case by the California State Courts, a suspect who was walking towards officers and was 10 to 15 feet away. They hit him with the, my understanding is, you know, your argument is that he was throwing the knife at the officers. Yes. Now what I understand, and basically without anything having happened to provoke that, if I understand what the plaintiff's view of this is, that they hit him with the beanbag and he dropped the knife or he dropped the knife sidearm, whether that's throwing with great force toward the officers or whether that's dropping in response to the beanbag, seems to me to be, you know, something that is disputed. With respect, Judge Schroeder, there's no evidence from which a jury could decide that. There is only argument of counsel. The iPhone video, the Court can watch for itself. It shows a deliberate, it's not a toss. It's a throw. It's very difficult to see. The moment of the throw. I'm sorry. I don't mean to interrupt you. The moment of the throw is certainly a throw. It's not a toss. You don't have any evidence from Mr. Dunklin that says, I was only tossing. It was not forceful. And we know that, in fact, the knife traveled to the officers. It skidded and hit one of their feet as it traveled. And so I don't think it's – a jury couldn't infer from these facts. Well, you know, if I understand it, he said he noticed that his shoe was cut. Yes. Later. Yes. The knife traveled with enough force to cut his shoe. In other words, it had enough momentum at that point that it – that it – Well, that's not quite right. I don't mean to split hairs. But I think the evidence is that it skidded. Yes. That distance. Yes. Sometime later in the day, he realizes his shoe was cut, and he's surmising maybe the knife cut my shoe. Yes. But he does not – That's different than saying that his throne was enough force to cut the shoe. We don't know that, right? Well, it was – yes. We don't know that the knife cut the shoe. I agree with that. We know that the knife – we do know that the knife was near the officers, where it came to rest. It was with the officers. But the other thing is that the officers are reacting to a throwing motion, and that is undisputed. There's no dispute about that. In fact, it's stipulated by plaintiffs. So even if this is merely a toss, the officers don't know that at the time they make the decision to shoot. And they are not required to wait and see whether it is merely a toss. It is clearly not a surrender. According to the video, he turns around. He turns around after he has thrown it. And I think that's clear from the video. He throws the knife sidearm and then spins the wheelchair around. And so I think – I mean, you know, he's coming off a three-day crack binge. I mean, it's maybe, you know, he's acting erratically. But he – the knife – that happens after, of course. He tosses the knife. It skids across. It hits the officer's feet. He turns the wheelchair. And he gets shot. Judge Schroeder, the shooting happened before that. Here's – the moment of the shooting is the moment the court has to focus on. What has happened is he has not immediately dropped the knife after being shot with the beanbag shotgun. Instead, what he does is he makes some sort of motion. The officers don't know at the moment they decide to shoot whether it is a – you know, a throw directed straight at one of their vital organs or whether it is a sidearm toss to the curb. They're reacting to a throwing motion. And that is undisputed. So these other things that happen afterwards – that the knife actually hits the ground and skids or that he then spins the wheelchair around – all of that has happened. All of that isn't relevant for the purpose of this court assessing at the moment of shooting whether a suspect in the process of throwing a knife nonetheless is entitled for the officers to wait and see what happens and where the knife goes before they shoot. I mean, if they are entitled to shoot before he even throws under law, then clearly they don't have to wait until the throw is completed. They can't be in a worse position because he actually completes the throw than they would have been if they had shot before the throw or if they had been faster. So opposing counsel suggests, well, why didn't the police just back up since the person is semi-immobilized in the wheelchair? Yeah. I mean, I think – you know, I think if it had occurred to them that he might throw, perhaps they would have backed up. But they're also – they're also trying to control him to protect other people. This is on 10th Street. This is a busy street. There are people walking by. You can see that in the video. So I think that the officers are trying to get control of this suspect as soon as possible in a safe way. And it could be that, you know, it was tactically not the best decision to be 20 feet away because they didn't – as the record shows at page 383, they didn't anticipate the throwing of the knife. But bad tactics don't make a use of force unreasonable unless there's some sort of provocation under Billington. An officer – that's exactly the kind of sort of Monday morning quarterbacking that courts aren't supposed to engage in under the Fourth Amendment. The officers here took a position that they believed was safe. That wasn't so unreasonable that they should have known better and that they actually put themselves in danger and deserved anything they got by – by, you know, the throw actually hitting one of them. But even if the Fourth Amendment analysis is in question here, qualified immunity clearly applies because there's no case that puts the officers on notice that they must not shoot in this situation. I think Sheehan makes that clear. Finally, I want to briefly address the Monell liability. I think that the – of course, if there is no Fourth Amendment violation, then there is no Monell liability. But for purposes of a bad policy, plaintiffs merely point to the fact that officers in San Francisco's simulation training are asked to explain their – their reasons for using force or not using force. And what plaintiff takes from that is a policy to allow shootings under a subjective fear rather than an objective fear, as Graham v. Connor requires. And I'll submit that there's simply no evidence of that in this record. The court has before it the training materials. They clearly state that the officers can only use force where it's objectively reasonable to do so. They discuss the cases. So I – that's – that's not enough to go to a jury on the Monell issue. And on the ratification issue, of course, the only – the only ratification evidence that plaintiffs present is that the – the Firearms Discharge Review Board said that this shooting was in policy. If – if we were to have Monell liability every time officers are not disciplined and a – and a review board says that they acted within policy, of course, we'd have the same kind of respondeat superior liability that the Supreme Court has disapproved. If there are no further questions, I'll submit. Thank you. MS. GOTTLIEB. Thank you for your argument. We'll give you a minute to reply. MR. BOUTROUS. I'd like to read from Law that is so different from this case. It's remarkable. In Law, it says, he held a large rock about the size of a football above his head. Law failed to drop the rock when ordered by Officer Arderby to do so. Law kept advancing at an irregular pace, forcing the officers to back up. Officer Arderby told Law, we're going to have to shoot you if you don't drop that rock. Law continued to advance, and when he was within a few feet of the officers, they shot him. That's not what happened here. This isn't – that isn't even close to this case. And Law wasn't in a wheelchair. And so to suggest that a man sitting in a wheelchair all of a sudden becomes Jim Bowie and is going to somehow miraculously throw a knife and hit you, it seems to me is just not consistent with common sense and police training. And by the way, we dispute as poppycock the defendant's argument that it never occurred to them that he would throw a knife at them. That is just absurd and inconsistent with all police training and common sense. They had to have assumed he might throw the knife at them. And that's a fact in dispute. You have six officers there, six, and you're telling me all six of them are standing about 20 feet away, and it hasn't occurred to anybody, geez, this guy might throw this knife at us. Can you wrap up, please? I'm done. Thank you very much. Okay. Thank you. I think we have your argument. We thank you for your argument. The case of Dunclan v. Malinger is submitted. The court will take a brief five-minute recess.
judges: Schroeder, Ikuta, Christen